Harper et als. vs. Citizens' Bank of Louisiana, et al.

51 511
d120 838

No. 12,720.

MRS. CHARLES W. HARPER ET ALS. VS. THE CITIZENS' BANK OF LOUISIANA.

SYLLABUS.

Decision of the case involves the interpretation of an explanatory agreement, or counter letter, as affecting or controlling a contemporaneous act of sale.

What is doubtful in an agreement is to be interpreted against him who has contracted the obligation.

A sale with the right of redemption is none the less a real sale. After the lapse of the redemptory period without the exercise of the equity of redemption, the conveyance is as complete and absolute as though the right had not been reserved.

For a right to be destructible by a condition, such condition must be expressed with clearness and precision.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Rightor, J.*

*James Wilkinson* and *E. H. McCaleb* for Plaintiffs and Appellees.

*Branch K. Miller* for The Citizens' Bank, Defendant and Appellant.

*James McConnell* for State National Bank, Defendant and Appellant.

Argued and submitted April 21, 1898.
Opinion handed down January 9, 1899.
Rehearing refused February 20, 1899.

NICHOLLS, C. J., and MILLER, J., disenting, filed separate opinions in this case.

The opinion of the court was delivered by

BLANCHARD, J. In 1892 a small sugar plantation in the parish of St. Bernard, known as "Creedmoor," was owned jointly by plaintiffs and defendants. That is to say, Mrs. Charles W. Harper (then the widow of W. P. Green) and Mrs. Charles H. Stewart, plaintiffs, owned an undivided half, in the proportion of two-thirds to the former and one-third to the latter; and the Citizens' Bank of Louisiana and the State National Bank of New Orleans, defendants, owned equally the other undivided half.

The banks were the holders of eight notes, each for one thousand dollars, with 8 per cent. interest thereon, drawn by Mrs. Green and Mrs. Stewart and secured by special mortgage on their interest in the plantation.

The aggregate of this indebtedness, principal and interest, on the 21st of June, 1892, was $8,325.55, and the same was past due and unpaid.

The banks were pressing for payment and the debtors stood in danger of the institution of foreclosure proceedings against the mortgaged property.

The cultivation of a crop of cane on the plantation was then under way for the year 1892, for the joint account, it would seem, of the

owners thereof, and some advances for conducting the planting oper-
ations had been made, procured through the credit of the banks.

It was figured that, besides the indebtedness on the notes as afore-
said, Mrs. Green and Mrs. Stewart owed the banks at the date men-
tioned (June 21, 1892) on account of advances to the plantation, the
further sum of $704.26, making at that date a total of $9029.81 due
the banks.

To settle this indebtedness the plaintiffs agreed to sell and con-
vey to the banks their interest in the plantation, and, accordingly, an
act of sale was executed carrying the agreement into effect.    This
sale, by its terms, purports an absolute conveyance of the property to
defendants for the price and sum of $9029.81.

It was duly registered in the conveyance records of the parish and
the banks entered upon full ownership and possession.

On the same day, June 21st, this act of sale was executed, the par-
ties entered into another agreement or contract, styled in plaintiffs'
petition and in the briefs a "counter letter." No reference whatever
to the same was made in the act of conveyance.

This contemporaneous writing recites the sale made by plaintiffs
of their interest in the plantation to defendants, declaring, in that
connection, that "the said banks now own the whole of said planta-
tion."

Then it stipulates that the banks, having assumed and taken
charge of the place, are to cultivate the same so as to make a crop of
sugar and molasses thereon during the then year 1892, advancing the
necessary funds for the purpose, with the proviso added that Mrs.
Green was to approve all orders or drafts for necessary expenditures.

This is followed by a clause setting forth that the right and privi-
lege of redeeming and buying back the property was given to the
vendors, which right was to continue in force up to the first of Febru-
ary, 1898, and the price at which they were to buy back was stipulated
to be the same they had sold the property for, with 8 per cent. interest
thereon from that date, and the payment to the banks of any balance
that may be due them on account of advances made to cultivate the
crop left after the sale of the crop.

And then is added, with only a semi-colon separating the same from
the preceding part of the clause, these important words:—"and the
said Mrs. Green and Mrs. Stewart will have one-half of the profits of

33

514      SUPREME COURT OF LOUISIANA.

Harper et als. vs. Citizens' Bank of Louisiana,

said plantation credited to them in case the place makes any profits this year."

Following this is a paragraph reciting that in case plaintiffs did not redeem the property as stipulated for within the time fixed, the plantation was to be sold at public auction on or about the 15th of February, 1893, after fifteen days' advertisement, on the terms of one-third cash, the remainder in one, two and three years, with retention of mortgage and vendor's privilege, etc.

The next and last clause declares that inasmuch as the only object of the banks in acquiring the property was to secure the debt due them, it is agreed that in case the property sold for such a price that the undivided half which plaintiffs had conveyed brought a sum· in excess of what the banks had paid them for it, with 8 per cent. interest from the date of conveyance, such excess or surplus, plus one-half of the profits, if any, made on the place during the year, or minus one-half of the losses, if there be losses, was to be paid over to them.

The plantation was cultivated by the banks, and the crop of sugar and molasses taken off at the end of the year. This sugar and molasses was sold and the bounty due thereon under the Act of Congress collected.

A statement of account was then made up. This is styled "Creedmoor Plantation Crop Account of 1892 in account with the Citizens' Bank of Louisiana and the State National Bank of New Orleans." It showed the debits of the plantation, its expenditures during the year; and exhibited its credits, the sums realized by sale of crops and from bounty collections.

The result of the year's business was a profit of $2256.05 as shown by this account.

The limit of time fixed in the counter letter for the redemption of the sale by plaintiffs expired without the exercise of the right.

Whereupon the plantation (the whole of it) was duly advertised for sale, as agreed on in the counter letter, and offered at public auction. At this offering it brought $8000.00 and was knocked down to the defendant banks.

Some time later this action was brought by Mrs. Green and Mrs. Stewart to enforce a demand for $4430.24 alleged to be due them, under the terms of the counter letter, as their share of profits averred to have been made on the Creedmoor plantation in 1892.

The contention is that the account kept by defendants against the

plantation for the crop year of 1892, should commence only at the date of the sale of plaintiffs' half interest in the property to defendants, for the reason that by said sale and conveyance all indebtedness then due by plaintiffs to defendants, whether by note or on account of previous advances made to the place, was settled.

So, it is averred, there should be deducted from the account all items of expenditure charged thereon prior to June 21, 1892, the date of the sale, and certain other items, and, this done, the account would show a profit to the plantation of $8860.48, one-half of which is represented to be due plaintiffs, for which judgment is demanded.

The banks do not agree in their defense. The Citizens' Bank avers that no profits were made, as a matter of fact, on the Creedmoor plantation in 1892, and that if there were any made, plaintiffs are entitled to no share therein because of the fact that they did not redeem and buy back the plantation within the redemptory period, the exercise of such right of redemption being the condition upon the happening or consummation of which only could they claim participation in the profits.

The State National Bank takes the position that, as shown by the explanatory agreement or counter letter, the only object the banks had in acquiring plaintiffs' half interest in the plantation was to secure the debt due the banks; that plaintiffs failed to exercise the equity of redemption as stipulated for; that thereupon the property was offered at public auction as directed in the counter letter, and adjudicated to the banks for $8000.00; and that the net proceeds of the crop of 1892, shown on the account kept by the banks with the plantation, to have been $2,256.05, in which plaintiffs claim to have had a contingent interest, were entirely absorbed and extinguished by the indebtedness due the banks.

It will be thus seen that the position of the first named bank is (a) no profits to be divided; (b) if profits, plaintiffs lost the right of sharing therein by the failure to redeem the sale.

That of the other defendant bank is, virtually, that there were, it is true, profits, but plaintiffs are entitled to no share therein because, having failed to redeem, the property was sold at auction for only $8000.00, one-half of which, or $4000.00, credited to plaintiffs on their general indebtedness to the bank, with the further credit of their share of the profits, would still leave a balance against plaintiffs instead of in their favor.

In other words, treating the first sale, that of June 21, 1892, as merely a security for the debt and as no longer having any effect upon and after the adjudication of the plantation at public auction, and treating the latter sale as the only one transferring the title and *its price* the only one to be considered, and calculating all the indebtedness, with interest, accruing to the banks, and crediting plaintiffs with their portion of the auction price realized and one-half the profits of the plantation for 1892, nothing is left for them to base the present action upon.

One bank denies profits, the other admits profits. One interprets the agreement or counter letter to mean that if profits were made, plaintiffs could not avail of them unless they redeemed the sale; the other does not hold to this interpretation, relying upon another defense. One affirms the conclusiveness and finality of the sale of June 21, 1892; the other that it was only a kind of security for the debt.

Plaintiffs' position is one of affirmance of the sale of June 21, 1892, and in this respect they are virtually supported by the Citizens' Bank, and actively opposed by the State National Bank.

Their further position is there were profits made on the plantation in 1892, and in this they are supported by the State National Bank and opposed by the Citizens' Bank.

Their further position is they are entitled to one-half of these profits, whatever they are, and in this they are opposed by both banks, one because they did not redeem the sale as stipulated for, the other because they must be held to the auction price of the plantation in figuring the credit they are entitled to on account of its sale, and because the account cast up on this basis, with their part of the crop profits added, would leave a balance against them.

Their further and last position is that the profits of the crop of 1892 amounted to the sum they claim in their petition, and in this they are opposed by both banks, who assert that if plaintiffs are entitled to anything at all in the way of a judgment for profits, it can not exceed the one-half of $2256.05 shown on the account as a credit to the plantation as the result of its cultivation in 1892.

From this analysis of the positions occupied in this litigation by the parties thereto, is deduced, as aids to a proper interpretation by us of the explanatory agreement or counter letter, the following conclusions:

1st. That the weight of opinion among the parties, construing

their own agreement, is that the sale of June 21, 1892, of a half inter-
est in the plantation by plaintiffs to defendants was a real convey-
ance and not merely a security for debt.

2nd.   That the weight of opinion among them is that if the plan-
tation made a profit in 1892 plaintiffs were to share therein to the ex-
tent of one-half, and this right to share in the profits was not depend-
ent on the redemption of the sale.

And we think this view of the meaning and intent of the counter
letter is supported by the terms of that instrument.    Undoubtedly
plaintiffs were, on the day the counter letter was executed, making a
present sale of their half interest in the plantation to the banks for
the price there stated, and the banks were acquiring the same, so that
thereafter the banks, in the language of the counter letter, "now own
the whole of said plantation."

A sale with the right of redemption is none the less a real sale.
After the lapse of the redemptory period without the exercise of the
equity of redemption, the conveyance is as complete and absolute as
though the right of redemption had not been reserved.

Nor does the subsequent clause in the counter letter, that if the
property was not redeemed by the vendors, it was to be sold at auction,
weaken this position.    That clause is construed as granting merely
a concession to the vendors by the vendees, a giving to them of a later
chance to see if their half interest might not be made to realize more
than the sum defendants had paid for it, and, if so, allowing them the
excess over what they had received at the previous sale.

That this was the intention of the parties is shown by the fact it is
no where stipulated that in the event the place, when sold at auction,
brought *less* (for the half interest belonging to plaintiffs) than what
the banks had paid them for it previously, they (plaintiffs) were to
make good to the banks their part of the deficit.    They were to have
the excess, if any—that was stipulated in the agreement; but not to
be held for the deficit, if any—that was not stipulated in the agree-
ment.    *Expressio unius est exclusio alterius.*

Undoubtedly the purpose of the banks in acquiring the property
was to realize the debt they held against it, and they were willing to
hand it over at the auction sale to any one who would pay sufficient
for it to return them the entire amount of money it represented to
them with interest, and hand over to the plaintiffs their share of the
surplus, if any.

It is in this sense that the words in the counter letter "inasmuch as the only object of the said banks in acquiring said property was to secure the debt due to said banks," are held to have been used.

The banks were willing to buy and did buy the half interest of plaintiffs in the property at the price ($9029.81) representing the sum agreed upon as that which plaintiffs then owed them. Besides this, they undertook "to run" the plantation and divide the profits, if any, with plaintiffs. This was reasonable when it is considered the crop was already pitched and under way for the year—the time being towards the end of June.

Plaintiffs were, under duress of debt, selling in the middle of the year, with reservation of certain rights, one of which was participation in the profits of the crop already under cultivation, and another was the equity of redemption of the sale.

This division of profits was an obligation the banks, who took charge of the plantation under their purchase, assumed towards plaintiffs. If there be doubt whether plaintiffs' right to participate in the profits exists as an independent proposition, or was dependent on the condition of the redemption of the sale, such doubt must be construed against the obligor.

"In a doubtful case," says C. C., 1957, "the agreement is interpreted against him who has contracted the obligation." 20 La. Ann. 363; 6 La. Ann., 204.

While the banks were to cultivate the plantation, making the necessary advances therefor, it was stipulated that Mrs. Green was to supervise the expenditures; she was to approve all orders or drafts. This is strongly corroborative. Why was she to have anything to do with the expenditures relating to the crop if she did not have an ultimate interest in the same? A profit could only be made by keeping down the expenditures, and she seems to have been invested with a veto power over the expenses.

It is true this might be said to apply as well to the case of participation in the profits only in event the sale was redeemed.

But at most it leaves the true meaning and intent doubtful, and the law just quoted applies.

For a right to be destructible by a condition, such condition must be expressed with clearness and precision.

Holding, therefore, that plaintiffs are entitled to an accounting for

the profits and to one-half of same, if any, the next inquiry is were there profits, and, if so, how much?

The lower court held there were profits and fixed the amount thereof at seven thousand three hundred and sixteen dollars and fifty-two cents, awarding plaintiffs a judgment for one-half thereof, or three thousand six hundred and fifty-eight dollars and twenty-six cents.

The plantation, the evidence satisfies us, made a profit in 1892, but we have reached a far different conclusion as to the amount thereof and as to what plaintiffs are entitled to a judgment for on that account, than did our brother of the court a qua.

The account of the plantation with the banks shows a total expenditures for the year of fifteen thousand five hundred and fifty-seven dollars and seventy-nine cents.

It shows total receipts from sale of sugar and molasses and from bounty collections of seventeen thousand eight hundred and thirteen dollars and eighty-four cents.

This leaves a balance of two thousand two hundred and fifty-six dollars and five cents in favor of receipts over expenditures. This is profit.

The correctness of this account was admitted on the trial. This meant that all the items of debit and credit thereon were correct.

This admission was made with the reservation on part of plaintiffs that they would contend the first item on the debit side of the account was covered and extinguished by the sale made of their half interest in the plantation in June, 1892; while defendants would contend it was not.

This first item appears on the account under date of June 18, 1892, and reads as follows: "To advances made through Pierre Lanaux as per account rendered from January 23, 1892, to June 18, 1892, $5,061.47."

This was an indebtedness due by the plantation at the date of the sale by plaintiffs of their half interest to defendants. The effect of plaintiffs' admission of the correctness of the account is to fix this item as a debt incurred on behalf of the crops of 1892. It was undoubtedly an expense incurred in behalf of the crop of 1892. Being such it must figure against the profits.

If this item is excluded as paid by the transaction resulting in the sale of plaintiffs' half interest in the plantation, which is the conten-

tion. of plaintiffs, then it would show a very much larger sum to be credited to them as "profits." But when we turn to that clause of the counter letter, on which alone is predicated their right to demand an accounting for the profits, we find it reads: "And the said Mrs. Green and Mrs. Stewart will have one-half of the profits *of said plantation* credited to them in case *the place* makes any profits *this year.*"

It will be seen it was not considered by the parties that they started with a clean score on the 21st of June of that year, and the profits were to be reckoned only on the basis of expenditures on the place to be thereafter made. If they had they would have said so. What they wrote into their agreement was that if *the plantation,* counting all expenditures for *that year,* made a profit, there was to be a division of the same.

Now, counting all the expenditures for the year, the plantation made a profit of only two thousand two hundred and fifty-six dollars and five cents. The admission aforesaid covers the disputed item as an expenditure of the plantation for the year, and the memorandum of indebtedness of plaintiffs and defendants, made out when they conveyed their half interest in the plantation to the banks, does not include this item. · The most that can be claimed for it is that it includes part of it.

That memorandum refers to "$1,408.53 crop advances due Pierre Lanaux, merchant, on 21st June, 1892," and debits plaintiffs with one-half thereof, cr seven hundred and four dollars and twenty-six cents, the same being one of the items going to make up the sum of nine thousand and twenty-nine dollars and eighty-one cents which figured as the price of the sale.

This $1,408.53 crop advances" due Lanaux may have been a separate account altogether from the one which afterwards figured in the plantation account as the first item for five thousand and sixty-one dollars and forty-seven cents. It is not, at least, certain that it entered into it.

But we will, still interpreting the agreement "against him who has contracted the obligation," give plaintiffs the benefit of the doubt, and hold that one thousand four hundred and eight dollars and fifty-three cents of the item of five thousand and sixty-one dollars and forty-seven cents was covered by the transaction resulting in the sale aforesaid, and plaintiffs part thereof extinguished by being included in the

price of the sale. Deducting this one thousand four hundred and eight dollars and fifty-three cents from the expenditures to be figured against the receipts or credits of the plantation, we have this result:

Expenditures ....................................$14,149 26
Receipts .................................... 17,813 84
Difference representing profits to be divided............ 3,664 58
Plaintiffs one-half thereof .......................... 1,832 29

for which sum they are entitled to judgment, with five per cent interest, from July 27, 1893, the date of the last collection of bounty and of the rendition of the account.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be amended by reducing same to the sum of one thousand eight hundred and thirty-two 29-100 dollars, with five per cent. per annum interest thereon from July 27, 1893, until paid, and as thus amended the same be and is hereby affirmed, costs of the lower court to be borne by defendants, those of this court by plaintiffs and appellees.

NICHOLLS, C. J., dissents, and hands down dissenting opinion.

MR. JUSTICE MILLER dissents on independent grounds.